UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DARRIKA VAN,                          )
                                      )
                Plaintiff,            )
                                      )
        v.                            )        No. 1:24-cv-00477-JRS-CSW
                                      )
INDIANA UNIVERSITY HEALTH, INC,       )
                                      )
                Defendant.            )

**Order on Motion for Summary Judgment**

This is an employment discrimination case. Darrika Van, a Black woman, seeks damages from her former employer, Indiana University Health, Inc. ("IU Health"), for allegedly terminating her because of her race and retaliating against her for complaining of race discrimination. (Am. Compl. ¶ 21–30, ECF No. 26.) IU Health moves for summary judgment on all remaining claims.[1] (Mot., ECF No. 48.)

As the only Black woman in her department, Van seems to have struggled to gain respect as a supervisor. But that does not mean her race was a but-for cause of her termination. She does not have evidence that IU Health treated other supervisors differently. Nor does she show that IU Health is lying about why they terminated her. It is suspicious that IU Health escalated their discipline of Van after she complained of race discrimination. But the record is devoid of any other bits of evidence that suggest IU Health would not have taken those actions had Van not

---

[1] Van has dropped a retaliatory failure-to-hire claim. *See infra* p. 10.

complained.  Those deficiencies, in short and as the Court further explains below, are why summary judgment is **granted** in favor of IU Health.

## I.    Factual Background

The following facts are not necessarily objectively true, but the Court presents them in the light most favorable to Van and draws all reasonable inferences in her favor.  Fed. R. Civ. P. 56; *Navratil v. City of Racine*, 101 F.4th 511, 516 (7th Cir. 2024).  Salient facts are recited with details omitted to be later elaborated on.  *See also* Fed. R. Civ. P. 56(c)(3) (courts need only consider materials cited by the parties).

### A.    The Hierarchy in Cardiac Rehab

Located in Methodist Hospital in downtown Indianapolis, the Cardiac Rehabilitation Department ("Cardiac Rehab") is an exercise and behavioral program that helps patients recover from vascular medical procedures.  (Van Dep. 21:19–23:21, ECF No. 49-27.)  The hierarchy in Cardiac Rehab resembles a pyramid.  At the bottom are exercise physiologists ("EPs") who are responsible for providing direct patient care.  (Nyland Decl. ¶ 7, ECF No. 49-32.)  In the middle are Supervisors who oversee orientation, scheduling, and interacting with patients.  (Hunt Dep. 30:7–31:3, ECF No. 57-4.)  Both the EPs and the Supervisor report to the Manager of Non-Invasive Cardiology who then reports to the Director of Cardiovascular Services.  (Van Dep. 27:16–28:2, ECF No. 49-27.)  Both the Supervisor and Manager have leadership duties, but what differentiates them is that only the Manager could issue discipline.  (Nyland Dep. 38:14–39:1, ECF No. 57-3; Nyland Decl. ¶ 16, ECF No. 49-32.)

## B.     The Cast

To help the reader envision this race discrimination case, the Court lists out the names, genders, races, and roles each person served at IU Health:[2]

- Ms. Courtney Hunt, Director of Cardiovascular Services (white)
- Mr. Brayton Nyland, interim Manager of Non-Invasive Cardiology (white)
- Ms. Darrika Van, Supervisor of Non-Invasive Cardiology (Black)
- Ms. Taylor Harman, Exercise Physiologist (white)[3]
- Mr. Kyle Purvis, Exercise Physiologist (white)
- Ms. Madalyn Allen, Exercise Physiologist (white)
- Mr. Alexander Liu, Exercise Physiologist (Chinese)
- Ms. Kelli Fletcher, Intermediate Human Resources Consultant (Black)
- Ms. Lauren Wang, ex-Manager of Non-Invasive Cardiology (unknown)

## C.     Signs of Van's Incivility, Nyland Promoted

Van started working for Clarian Health in 2009, which was later acquired by IU Health.  (Van First Aff. ¶ 5, ECF No. 57-1.)  She received several promotions throughout her career.  (*Id.* at ¶¶ 6–11.)  Things started to go south in December 2021 when she was put on a Performance Improvement Plan that required her to sign and implement a "Civility worksheet." (2021 PIP 1, ECF No. 49-1.)  She had apparently been "micromanaging" the EPs, including EP Purvis.  (Van Email to Riggin 13–14, ECF No. 49-2.)   Coaching conversations were had in September, October, and December 2022 about avoiding an environment of "incivility and fear" and not criticizing team members in front of patients.  (*Id.*; Corrective Action I 2, ECF No. 49-

---

[2] The racial and gender identifications are based off various people's assertions and are not disputed by the Parties.  (Nyland Dep.Tr. 56:25–57:14, ECF No. 57-3; Fletcher Dep.Tr. 90:4–24, ECF No. 57-5.)  The roles are similarly confirmed and uncontested.  (Nyland Decl. ¶¶ 8, 15, ECF No. 49-42; Hunt Decl. ¶ 6, ECF No. 49-31; Fletcher Decl. ¶ 4, ECF No. 49-33.)

[3] Van and several depositions refer to "Harmon," but the Court construes them as referencing Harman, which is how her name appears in the email exhibits.  (*E.g.*, Harman Email, ECF No. 49-8, at 6.)

7.)  Van apologized to EP Purvis for her behavior.  (Sept. 2 Email, ECF No. 49-6, at 46.)  Soon after, then-Manager Wang transferred, and it was agreed between Wang, Hunt, and Nyland that the EPs would informally report to Nyland while Van would continue as Supervisor.  (Nyland Decl. ¶ 10–11, ECF No. 49-32.)  Van was excluded from this meeting.  (Oct. 21 Email, ECF No. 49-6, at 41.)  In December 2022, Nyland was promoted from Supervisor to interim Manager and became Van's direct supervisor, even though Van had worked at IU Health longer.  (Nyland Decl. ¶ 4, 16, ECF No. 49-32.)

Van complained that IU Health only promoted her to Supervisor to "manage [her] out."  (Fletcher Email 2, ECF No. 49-18.)  That is, even though she had informal leadership duties, she had no one to lead and no direct reports.  (Nyland Dep. 63:20–64:5, ECF No. 57-3; Van May 16 Email, ECF No. 49-17, at 2.)  The EPs did not like reporting to Van and would not follow her instructions, preferring only to listen to Nyland's.  (Van Dep. 89:17–94:9, 94:4–9, ECF No. 49-27.)  Van does not dispute, however, that the EPs reported directly to Nyland.  (Pl.'s Resp. 3, 5, ECF No. 56 (acknowledging that Nyland was supposed to address issues with EPs' performance)).  This led Van, in February 2023, to have a conversation with Nyland about race and how, even if the two of them say same thing, the EPs would perceive it differently if it came from Nyland.  (Van Dep. 77:13–78:11, 170:7–9, ECF No. 49-27 (stating they have "discuss[ed] race discrimination")).

Van felt she needed to chastise the EPs because they were often lackluster at their jobs.  For example, EP Harman would often sit in the break room doing nothing and

neglect to clean equipment. (Van Second Aff. ¶ 13, ECF No. 57-12).[4] EP Liu would not timely send out treatment plans. (*Id.* ¶ 15.) EP Purvis shared these same faults and had persistent attendance issues, calling out of work approximately ten times. (*Id.* ¶¶ 11, 14; Hunt Dep. 71:12–18, ECF No. 57-4.) The EPs' misconduct caused Van to suffer because if a task was left unfinished, Nyland would have Van complete it. (Van Dep. 80:19–22, ECF No. 49-27.) Van complained to Nyland about this inequitable task completion in their conversation about race in February 2023. (*Id.* at 95:3–96:2.)

Nyland never formally disciplined any of the four EPs, despite receiving Van's complaints. (Nyland Dep. 49:20—51:9, 53:12–54:8, 55:3–56:12, ECF No. 57-3.) Nyland asserts he talked to Purvis, but Purvis testified he never received even an informal disciplinary action from Nyland. (*Id.* at 48:8–20; Purvis Dep. 16:2–7, ECF No. 57-6.) In fact, after Van was terminated, Purvis became "team leader" and assumed some of her duties. (Nyland Dep. 40:21–25, ECF No. 57-3; Hunt Dep. 71:12–18, ECF No. 57-4.)

### D.    EPs Complain, Corrective Actions Follow

The EPs lodged complaints about how Van communicated with them. All on December 9, 2022, around the same time, EPs Allen, Purvis, and Harman emailed Hunt and Nyland about Van. After finding a monitor with an electrode still attached,

---

[4] IU Health argues that Van's two affidavits are a sham and should be excluded. (Def.'s Reply 4–5, ECF No. 61.) The sham affidavit rule essentially prevents parties from submitting affidavits that conjure an issue of material fact out of nothing. *James v. Hale*, 959 F.3d 316 (7th Cir. 2020). Van's second affidavit does supplement factual details she omitted in her deposition, but the facts are not so material or inconsistent that exclusion of the entire affidavit is warranted.

Van embarrassed the person who cleaned it by singling them out and saying "[c]learly, you need to get your eyes checked." (Allen Compl. 3, ECF No. 49-3.) Van would only communicate through email, not elaborate in-person, and made the EPs feel incompetent and micromanaged. (*Id.* at 1–2; Purvis Compl., ECF No. 49-4; Harman Compl., ECF No. 49-5.) Van met with Nyland about these complaints, wherein Van denied only one of the alleged incidents as fake, and Nyland issued Van a Corrective Action I. (*See* ECF No. 48-7.)[5] Per that action, Van was tasked again to review the "civility worksheet" and to not "make passive aggressive comments or exhibit any negative behaviors toward the team." (*Id.* at 2–3.)

On February 2 and February 10, 2023, EPs Harman and Purvis each submitted another complaint to Hunt and Nyland about Van. (February Compls., ECF Nos. 49-10–11.) These echoed many of the same concerns as before, and Van does not dispute these allegations before the Court. Van apparently discouraged a patient from pursuing a goal of walking one mile and made comments about that to the rest of the class. (Harman Compl. 2, ECF No. 49-10.) No disciplinary action followed.

On May 1 and May 8, 2023, EPs Harman and Purvis each complained again to Hunt and Nyland about Van. (May Compls., ECF No. 49-12–13.) Along with repeated concerns about her lack of communication and making the EPs feel berated and micromanaged, Van also commented to a patient that she could train anyone in six months, but she could not "train these personalities." (Harman Compl. 2, ECF

---

[5] Level I is the lowest level corrective action that a manager can take. (*See generally* Fletcher Dep. 41:17–44:1, ECF No. 57-5.) Level III is the highest and can involve suspension up to voluntary or involuntary termination. (*Id.*; Corrective Action Policy 8, ECF No. 49-24.)

No. 49-12). When Nyland and Hunt asked Van about the comment, she did not deny making it, rather, she maintained it was a joke. (Van Dep. 102:14–22, ECF No. 49-27.) The next day, Nyland issued Van a Corrective Action III.[6] (*See* ECF No. 49-15.) The action explained that Van had violated IU Health's policy against "Harassment and Workplace Violence Prevention," which prohibited repeated conduct that caused a person to feel demeaned, humiliated, or uncomfortable. (*Id.*) Violators would be subject to corrective action, up to and including termination if the behavior unreasonably created an intimidating, hostile, or offensive work environment. (*Id.*) As a result, Van was to be demoted to an EP. (*Id.*)

### E.    Corrective Action III Leads to Termination

Van did not agree with Corrective Action III—"Refused to Sign" is marked on the signature line.[7] (Actions 2, ECF Nos. 49-15–16.) On May 15, 2023, Van contacted Fletcher, in HR, to request "problem resolution" on her demotion. (May 15 Emails, ECF No. 49-17, at 5–6.) Van explained that she wanted to stay employed, so that she could potentially look for a job elsewhere, but that she also wanted to "build the cardiac rehab program with [Nyland]." (May 19 Email, ECF No. 49-18, at 6.) She preferred a position like what she had before she became a Supervisor, with no direct reports, and one that reflected the 14 years she had dedicated to IU Health. (*Id.*)

---

[6] Nyland reduced this to a Corrective Action II, but since both actions contain identical reasoning and signatures for the disciplinary action, the Court mostly refers to Corrective Action III. If it remained a Level III, Van would have been temporarily ineligible for a job change or transfer, pay increases, and incentive payments. (Corrective Action Policy 8, ECF No. 49-24.)

[7] This was likely written by a leader to indicate Van received the corrective action but did not want to sign. (Fletcher Email, ECF No. 49-19, at 3.)

7

From the beginning, Van explicitly cited racial discrimination as a concern.  Van felt like nobody would acknowledge that the team members were biased against her because of her race.  (May 16 Email, ECF No. 49-17, at 2.)  She had "several conversations about race with [Nyland,]" likely referencing her February 2023 conversation about cultural differences.  (*Id.*)  She expressed her frustration at microaggressions; for example, Hunt commented on how she preferred some hairstyles of Van's over others and Nyland commented about "finding somebody with a more booming voice than [Van's.]"  (*Id.* at 2; May 18 Email, ECF No. 49-18, at 3; Van Dep. 114:6–115:18, ECF No. 49-27.)  Nyland had not thought much of Van's "training these personalities" comment until it was reported to Hunt, and Van believed if another team member had said it, they would not have been punished as harshly.  (May 22 Email, ECF No. 49-19, at 2 (referring to the "incident."))  Van had "never been as mistreated, gas-lighted" as she had been in those past three years. (May 16 Email, ECF No. 49-17, at 4.)

Van took some time off between May and June.  (Van Dep. 127:9–15, ECF No. 49-27.)  When she returned, on June 7, 2023, Nyland, Hunt, and Fletcher met with her and issued an ultimatum: she could either (1) take the demotion to EP with the same pay rate but get, instead of wage increases, lump sum amounts, (*id.* at 128:16–129:21); or (2) take a re-assignment, a process where she would have 30-days of non-working paid leave to get re-hired at another position within IU Health.  (June Emails, ECF Nos. 49-20, at 5–6.)  If she was not re-hired in those 30 days, IU Health would involuntarily terminate her.  (*Id.*)

Van responded, a week later on June 15th, that neither option benefitted her and that she did not want to be demoted. (*Id.* at 5.) Unlike the emails in May between just Fletcher and Van, Nyland and Hunt were copied on these emails. (*Id.*) Van told all three of them that, "I truly believe this is due to my race" and "My punishment is more severe than my white counterparts." (*Id.*) She highlighted the incongruity between Nyland issuing this involuntary job change but never meeting with the EPs, despite her lodging many complaints about their inadequate performances. (*Id.* at 3; Van's Text Compls., ECF No. 57-11.)

Fletcher gave Van one day after she complained of the racial discrimination described above to make her choice. (June Emails, ECF No. 49-20, at 2.) On June 20, after receiving no response from Van, IU Health removed the option for Van to stay as an EP. (Van Dep. 131:21–132:13, 133:4–9, ECF No. 49-27; Memorandum of Understanding ("MOU"), ECF No. 49-22.) She now faced a new ultimate: resign from IU Health altogether or go on re-assignment. (MOU, ECF No. 49-22.) Van chose re-assignment. (Van Dep. 132:16–133:7, ECF No. 49-27.)

Fletcher limited Van's search for another position to roles that would not involve "people management." (Van Dep. 142:24–144:6, ECF No. 57-2 (discussing an email from Fletcher labeled as Exhibit 38); *see also* Re-assignment Process 2, ECF No. 49-26 ("Employee will apply to open positions that fit guidelines provided by Manager/HRC.")) Van applied to five different positions during her 30-day re-assignment, but she was not re-hired. (Van First. Aff ¶¶ 29–30, 35–36, 40, ECF No. 57-1; Van Dep. 135:22–136:13, ECF No. 49-27.) In Fletcher's opinion, Nyland could

have permitted Van to return. (Fletcher Dep. 46:11–47:16, ECF No. 57-5.) But the re-assignment policy stated that any employee not offered another position would be terminated. (Re-assignment Policy 2, ECF No. 49-26.) On July 25, 2023, IU Health involuntarily terminated Van. (Termination Letter 2, ECF No. 49-23.)

### F. This Lawsuit

Van filed a charge with the Equal Employment Opportunity Commission and received a notice to sue on April 27, 2024. (Am. Compl. ¶ 2, ECF No. 26.) She filed an amended complaint to this Court on August 16, 2024. (ECF No. 26.) Van later withdrew and now presents no evidence on her retaliatory failure-to-hire claim. (Am. Compl. ¶¶ 29–30, ECF No. 26; Am. Case Management Plan § IV(B), ECF No. 21; Pl.'s Statement of Claims 1, ECF No. 44.) Consequently, the Court only rules on Van's race discrimination and retaliation claims brought under Title VII, 42 U.S.C. § 2000e-2(a)(1), (3)(a), and 42 U.S.C. § 1981. (Am. Compl. ¶¶ 21–28, ECF No. 26.) IU Health moves for summary judgment on both claims. (Mot., ECF No. 48.)

## II. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when admissible evidence in the record is such that a "reasonable jury" could find for the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The substantive law—here

Title VII—determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must consider all "relevant" evidence of discrimination "as a whole," regardless of whether it "can be labeled 'direct' or 'indirect.'" *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The Court cannot "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's versions of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Instead, the Court views the evidence in the light most favorable to Van and asks whether a reasonable juror could conclude that she would have kept her job if she was a different race, and everything else had remained the same. *Ortiz,* 834 F.3d at 764.

## III.    Disparate Treatment Claim

Title VII prohibits employers from "discharg[ing] any individual . . . because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Race must have been "a but-for cause" of an adverse employment action. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020); *Saud v. Depaul Univ*, No. 25-1034, 2025 LX 436871, at *5 (7th Cir. Oct. 8, 2025) (applying same standard and analysis to claim under 42 U.S.C. § 1981). To meet this standard, a plaintiff may invoke the *McDonnell Douglas* framework. First, the plaintiff proves a prima facie case of racial discrimination. Then their employer must articulate a "legitimate nondiscriminatory reason" for the adverse employment action. To prevail, the plaintiff must show the

articulated reason is pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 793, 802, 804 (1973).

Here, to establish a prima facie case, Van must put forth admissible evidence sufficient for a jury to find that she (1) belongs to a protected class; (2) met IU Health's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who were not members of her protected class. *Saud*, 2025 LX 436871, at *6. IU Health argues that Van failed to meet her burden of proof on every prong except the first. (Def's. Br. 19, 22, ECF No. 51.) The Court holds that Van fails on the second and fourth.

## A.    Subjected to Adverse Action

To start, the Court must address IU Health's curious contention that Van caused her own termination by failing to get re-hired, and thus, IU Health took no adverse employment action. IU Health believes that because it only offered to demote Van, then forced her into a process where she had to get re-hired by a different department or else be terminated, that somehow Van subjected herself to an adverse action. (*Id.* "Statement of Material Facts," ¶¶ 8, 12–15; Def.'s Reply 8–9, ECF No. 61.) The Court is not persuaded by this.

An adverse action can take many forms. It can be any "quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Paterakos v. City of Chi.*, 147 F.4th 787, 796 (7th Cir. 2025) (quoting *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018)). It is not "limited to economic or tangible discrimination," *Meritor Savs. Bank, FSB v.*

*Vinson*, 477 U.S. 57, 64 (1986), and can encompass any harm to an employee's career prospects as long as it is not one that merely makes the employee "unhappy," *Paterakos*, 147 F.4th at 796. Whether an action is adverse can sometimes be clear as a matter of law, but other times "the question is not so obvious" and is a triable question of fact. *Thompson Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407–08 (7th Cir. 2010); *see also* Seventh Circuit Jury Instruction § 3.01, Comment E (describing it as an issue in "rare cases").

Here, IU Health disputes that Van was terminated, but their dispute is not genuine. At the end of her 30-day re-assignment period, Van was involuntarily terminated from Cardiac Rehab. (Termination Letter, ECF No. 49-23.) Termination is, undoubtedly, an adverse action. *See McDonnell Douglas*, 411 U.S. 793. So, as a matter of law, Van suffered an adverse action. The fact that IU Health offered Van a chance to first transfer to a different department does not change the fact that Van was ultimately terminated.

IU Health also argues that Nyland did not terminate Van because the re-assignment process dictated Van's termination. (Def.'s Reply 9, ECF No. 61.) This is an ineffective attempt to sidestep Nyland's responsibility as the ultimate decisionmaker for the termination and discipline of his direct reports, including Van, which IU Health repeats in all its declarations. (Nyland Decl. ¶¶ 29, 31, ECF No. 49-32; Hunt Decl. ¶¶ 19, 21, ECF No. 49-31; Fletcher Decl. ¶¶ 13–14, ECF No. 49-33.)

Therefore, the Court treats Nyland as the person at IU Health who decided to terminate Van.[8]

Because Van was terminated, the Court need not decide whether, on its own, instituting the re-assignment process would have been an adverse action. Van argues that the process was an adverse lateral transfer because she was prohibited from applying to positions involving "people management." (Van Dep. 142:24–144:6, ECF No. 57-2); *see Muldrow v. City of St. Louis*, 601 U.S. 346, 347 (2024) (holding transfer adverse when accompanied by harm respecting an identifiable term or condition of employment). But what is peculiar about this case is that IU Health did not transfer Van; she had to apply to other departments and be re-hired to transfer. (Fletcher Dep. 45:4–47:10, ECF No. 57-5.) Thus, characterizing IU Health's re-assignment process as a transfer appears inaccurate. Nevertheless, because the re-assignment process ended with Van's termination, the Court holds Van has met her burden of proving she suffered an adverse action. Van is not out of the woods, yet, because she fails to meet her burden on the rest of her prima facie case.

### B.    Meeting Employer's Legitimate Expectations

To meet the second prong of her prima facie case, Van must demonstrate she was performing adequately "at the crucial time when the employment action is taken." *Dear v. Shinseki*, 578 F.3d 605, 610 (7th Cir. 1993) (quoting *Fortier v. Ameritech Mobile Communs.*, 161 F.3d 1106, 1112 (7th Cir. 1998)). The crucial time, here, is

---

[8] This is bolstered by Fletcher's opinion that Nyland had discretion to permit Van to return after the 30-day re-assignment period. (Fletcher Dep. 46:23–47:10, ECF No. 57-5.)

June 7, 2023, when Nyland, Hunt, and Fletcher offered Van the choice between re-assignment or demotion. (Van Dep. 127:4–23, ECF No. 49-27.)

By then, Nyland had already received numerous complaints from EPs Harman, Purvis, and Allen about Van's behavior in December 2022, February 2023, and May 2023. (EP Compls., ECF Nos. 49-3–5, 10–13.) When asked about how Van's performance compared to the EPs, Nyland testified that "[the EPs] were meeting expectations of their role, and that [Van] was not meeting expectations of her role as far as leadership and informal leadership duties went." (Nyland Dep. 63:18-22, ECF No. 57-3.) When asked to elaborate, Nyland recalled complaints "at the time" by team members who felt "belittled" or "intimidated" by Van's "sarcastic comments." (*Id.* at 64:10–17, 66:18–67:3.) The complaints in May immediately preceded, and were discussed at, a meeting between Van, Nyland, and Hunt on May 9th, which then led to Van's demotion on May 10th with Corrective Action III. (Van Dep. 101:11–102:22, ECF No. 49-27; Nyland Decl. ¶ 24, ECF No. 49-32.) Van does not dispute that what the EPs alleged occurred or how they felt but maintains that her actions were taken out of context.[9] (Van Dep. 72:4–18, 102:12–22, ECF No. 49-27 (discussing Corrective Action I and the May Emails.)) Corrective Action III stated that Van violated IU policies by creating "an environment of fear and micromanagement." (Corrective Action III 2–3, ECF No. 49-15.)

---

[9] Van does not dispute that she audited patient treatment plans in a way that made the team feel "incompetent, embarrassed, and belittled;" that she told a team member they "need to get [their] eyes checked" after they negligently cleaned a monitor, (Corrective Action I 2, ECF No. 49-7); that she told a patient she "cannot train these personalities," and that she told the team she would provide lunch "if they were able to do as much work as her," although she maintains these last two comments were jokes. (Corrective Action III 1, 3 ECF No. 49-15.)

The events leading up to Van's demotion indicate she was not adequately performing around the time of the adverse action. Between May 10th, the day of Corrective Action III, and June 7th, the day of re-assignment, Van took time off, (Van Dep. 127:9–15, ECF No. 49-27 (May 25th to June 6th)), and worked while refusing the demotion and disciplinary action. (Van Emails, ECF Nos. 49-17, 18.)

In her defense, Van points to positive reviews of her performance untethered to the crucial time of June 7th, 2023. First, Van alleges that on March 27, 2023, Nyland stated Van was a "fully successful employee." (Performance Eval., ECF No. 57-9.) But that review was not about then-existing performance; it was about Van's performance in 2022. The only review Van has close to June 7th is an email from Fletcher on May 18th that Hunt "does not want [Van] terminated" and believes Van performs her job well. (Email, ECF No. 49-18, at 10–11.) But immediately following that sentence, Fletcher recapped "[t]he only concern is people management." (*Id.*) Van also identifies one hollow statement by Nyland that Van "was qualified to be a supervisor of cardiac rehab . . . based on minimum job requirements as far as education and time spent in healthcare." (Nyland Dep. 57:18–58:1, ECF No. 57-3.) This does not dispute that, leading up to June 7th, Nyland felt Van's comments created "unhealthy" environment," even when "meant as a joke."[10] (Corrective Action III 2–3, ECF No. 49-15.)

---

[10] Van does dispute some things the EPs claimed she did. (Van Dep. 65:23–69:11, 88:1–89:10, 92:8–93:22, ECF No. 49-27.) Even assuming the EPs fabricated their complaints, her argument still fails. Her burden is to dispute the genuineness of Nyland's belief in those complaints, which is not the same as proving the complaints were false. *Galvan v. State*, 117 F.4th 935, 939 (7th Cir. 2024) ("The focus is not on the wisdom of the decision, but on its genuineness."); *see also infra* p. 23 (addressing Van's "honest belief" argument).

Van's failure to properly address IU Health's assertions of fact means the Court may consider those facts undisputed. Fed. R. Civ. P. 56(e); *see Tomanovich v. City of Indianapolis*, 457 F.3d 656, 666 (7th Cir. 2006) ("[A]dmission to the conduct at issue prevents [plaintiff] from establishing [she] was meeting the [employer's] legitimate expectations."). None of Van's examples meaningfully dispute what the record shows: around June 7th, 2023, Nyland believed Van was not meeting their expectations as a Supervisor when interacting with EPs in Cardiac Rehab. Thus, Van has not met her burden, on the second prong of her prima facie case, to prove that at the "crucial time," she was adequately performing. *Shinseki*, 578 F.3d at 610.

## C. Similarly Situated Individuals

Even if Van could show a genuine dispute as to whether she was meeting expectations, she would still need to meet the fourth prong of her prima facie case: IU Health treated similarly situated employees outside of her protected class more favorably. Whether a comparator is similarly situated is often a question for the factfinder, *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 918 (7th Cir. 2022), but district courts can also determine the question as a matter of law. *E.g.*, *Saud*, 2025 LX 436871, at *8–9 (affirming summary judgment due to lack of comparator evidence). In her opposition to summary judgment, Van argues the relevant, similarly situated employees are the four EPs. Van lays bare how the EPs were not performing their job duties and escaped discipline while she was disciplined at least three times. (Pl.'s Resp. 6–9, ECF No. 56.) The EPs, indeed, "dealt with the same supervisor," but there is no evidence that they "engaged in similar conduct without

such differentiating or mitigating circumstances as would distinguish their conduct or [Nyland's] treatment of them." *Id.* at 8 (quoting *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 894 (7th Cir. 2025)). Consequently, Van's comparisons, even when assumed to be fully accurate, are not what the Court must look for.

The aim of the *McDonnell Douglas* prima facie case, and this fourth prong especially, is to raise an inference that an employer intentionally discriminated on the basis of a protected characteristic. *See Filar v. Bd. Educ. City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination."). To logically raise such an inference, the comparator must be similar enough to "eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, so as to isolate the critical independent variable:" racial bias. *Humphries v. CBOS West Inc.*, 474 F.3d 387, 405 (7th Cir. 2007); *see also Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 557–58 (7th Cir. 2011) (applying *Humpries'* logic to racial discrimination claim).

Here, by calling the EPs her "subordinates," Van concedes that the EPs did not work in the same role as her and, thus, cannot be similarly situated.[11] Employees who have "no supervisory responsibilities" are "employed in a totally different capacity" than those who do. *Shinseki*, 578 F.3d at 610 (affirming summary judgment

---

[11] At times Van refers to the EPs as her "subordinates," but at others they are her "co-workers." (Pl.'s Resp. 9–10, ECF No. 56; Am. Compl. ¶¶ 7, 9, 13, ECF No. 26.) The Court construes "co-workers" to mean they work in the same place but not that they are of equal rank. For example, co-workers at the same level would not typically approve each other's time-off requests, which Van did for the EPs. (*E.g.*, Van Email 5, ECF No. 49-8.)

because plaintiff supervisor failed to present a comparator with similar supervisory responsibilities).  It is undisputed the EPs did not have supervisory responsibilities and performed more face-to-face patient care whereas Supervisors, like Van, spent more time leading the team and overseeing scheduling.  (Nyland Dep. 20:24–22:15, ECF No. 57-3 (distinguishing the two roles.))  Van insists that Nyland held her to a higher standard than the EPs, but an employer is allowed to hold lower-ranking employees to lower standards.  *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009).

Furthermore, Van's misconduct differed from the EPs'.  *See Reives v. Illinois State Police*, 29 F.4th 887, 892–94 (7th Cir. 2022) (finding comparator different because violated different rules).  At most, Van could convince a jury that EP Harman would "sit in the break room during work hours," "not complete her daily inpatient assignments," and neglect or improperly clean equipment, (Van Second Aff. ¶ 13, ECF No. 57-12); that EP Purvis did the same but also "had persistent attendance issues and called out of work approximately ten times," (*id.* ¶ 14); and that EP Liu would not timely send out treatment plans or "call patients to follow up with them," (*id.* ¶ 15).  None of these are the same shortcomings identified by Nyland as his reasons for putting Van on the re-assignment process.  *Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir. 2018) (affirming summary judgment because coworker did not have "comparable set of failings").  Van's comparisons lack relevance because she does not show the EPs are "directly comparable to [her] in all material aspects so as to eliminate other possible explanatory variables."  *Saud*, 2025 LX 436871 (citation modified) (quoting

*Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 810 (7th Cir. 2025)).  Thus, Nyland's differential treatment of Van and the EPs can be explained by the difference in their misconduct and their job descriptions, rather than the difference in their races.

In summary, Van fails to raise a prima facie inference that IU Health intentionally discriminated on the basis of race.  She has not provided evidence sufficient for a reasonable jury to find that she was performing adequately when IU Health took the adverse action or that she was treated less favorably than a similarly situated employee outside of her protected class.  Van's lack of a prima facie case, alone, is enough to warrant summary judgment for IU Health.  But the Court bootstraps its conclusion by explaining why there is also no showing of pretext.

### D.    Proffered justifications are not pretext

IU Health avers that it terminated Van because her communication style and interactions with the EPs violated its policy against creating an intimidating work environment.  (Def.'s Br. 20, ECF No. 51.)  The clash between Van's communication style and the EPs' work ethic may have been the result of "race and cultural difference, and social baggage" and the fact that Van was the "the first/only different" employee at her supervisory level. [12]    (Van Dep. 77:11–78:12, ECF No. 49-27.)  Regardless, disciplining an employee for communication that is "confrontational and not solution-oriented" is legitimate and non-discriminatory.  *Abebe v. Health & Hosp.*

---

[12] Van has constantly been denied chances to meet with her team because, apparently, the team is "afraid of [her]."  (Van Email to Fletcher, ECF No. 49-17, at 4.)  Hunt and Nyland have told her "on several occasions that [she] has to get the team to trust [her]."  (*Id.*)

*Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (quoting defendant employer's performance review).

Despite appearing legitimate, an employer's proffered reasons may be pretext for discrimination. If the non-moving party can so prove, then the factfinder is *permitted* to infer intentional discrimination and summary judgment is defeated. *Murphy*, 140 F.4th at 911 (quoting *Bless v. Cook Cnty Sheriff's Office*, 9F.4th 565, 573 (7th Cir. 2021)); *see also St. Mary v. Hicks*, 509 U.S. 502, 511 (1993). "To say that an employer's justification is a pretext means to say that it is a lie," and for a plaintiff to meet that burden, they must identify "weaknesses, inconsistencies, or implausibilities" in employer's justifications. *Murphy*, 140 F.4th at 914 (citation modified). Here, Van fails to poke holes in IU Health's generally consistent explanations.

Van's arguments for pretext mirror her "similarly situated" argument. That is, she suspects IU Health's reasons because whenever the EPs complained about Van, Nyland would discipline her; whenever Van complained about the EPs, Nyland would do nothing. (Pl.'s Br. 17–18, ECF No. 56.) The record betrays Van, however, because the EPs complained to Nyland twice in February 2023 and no disciplinary action followed. (*See* February Emails, ECF Nos. 49-10–11; Van Dep. 84:15–85:4, ECF No. 49-27 (referring to emails marked as Exhibit 17 and 18.)) Such fallacies in Van's own argument weakens her attempt to disprove IU Health's justifications.

Lastly, the Court considers evidence of Nyland and Hunt's possible racial animus. "A remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923,

934 (7th Cir. 2020). When Van returned to work after being given Corrective Action III, Hunt wanted to discuss which hairstyles of Van's she preferred over others, which could carry explicit racial overtones. *Lattimore v. LP Bremen Mgmt. LLC*, 2025 LX 132124, at *15 (N.D. Ind. June 26, 2025); (May 16 Email, ECF No. 49-17, at 4.) Van also said she was "tired of having discussions about how loud [she] talks," likely referring to a comment by Nyland about "finding somebody with a more booming voice than [Van's]." (*Id.*; May 19 Email, ECF No. 49-18, at 2.)

Ultimately, viewing the evidence as a whole, the Court finds no reasonable jury could believe IU Health's justifications were a cover-up for intentional race discrimination by Nyland. *See Stockwell v. City of Harvey*, 597 F.3d 895, 903 (7th Cir. 2010) ("The perception of the decisionmaker is controlling."). While Hunt's comments about Van's hair indicates possible racial bias, there is no indication Nyland felt the same way. Van concedes that Nyland "made the decision to involuntarily terminate Ms. Van," (Pl.'s Resp. 4, 18, ECF No. 56), not Hunt, who only "provided guidance," (Hunt Decl. ¶ 21–22); *see Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783–84 (7th Cir. 2004) (disregarding comments from those who recommended adverse action but who were not ultimate decisionmaker). Van advances no "cat's paw" theory that Hunt's racial bias—or the EPs'—influenced Nyland's decision. *E.g.*, *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). Thus, it is insufficient for summary judgment to show that Hunt exhibited racial animus.

As for Nyland, the Court is not convinced that one comment about Van's voice would lead a reasonable jury to find IU Health's non-discriminatory reasons

"unworthy of credence." *Murphy*, 140 F.4th at 914 (quoting *Marnocha v. St. Vincent Hosp & Health Care Center, Inc.*, 986 F.3d 711, 721 (7th Cir. 2021)).   Nyland's comment could suggest he may not have honestly believed that Van was creating an intimidating work environment.   *See Gordon v. United Airlines*, 246 F.3d 878, 889 (7th Cir. 2001).   But that implication is weak since Van has not successfully refuted all the incidents that caused Nyland to develop his belief.   (Van Dep. 102:14-22, ECF No. 49-27 (downplaying behavior as a joke.))   Even assuming Nyland credited the EPs' complaints more than Van's, that may have been "inaccurate, unfair, foolish, trivial or baseless;" but that is not proof they were false or that Nyland's belief in them was not honest.   *Saud*, 2025 LX 436871, at *14 (quoting *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023)).

With that, the Court concludes Van has not made a showing of pretext that is "sufficient to *permit* an inference of intentional discrimination." *Murphy,* 140 F.4th at 911 (citing *Hicks*, 970 U.S. at 511).   The Court grants summary judgment for IU Health on Van's race discrimination claim under Title VII and Section 1981.

## IV.    Retaliation Claim

Now, the Court turns to Van's retaliation claim under Title VII and Section 1981.

### A.    Methods of proof

Title VII also prohibits employers from discriminating against an employee because the employee "opposed any practice made an unlawful employment practice" by that title. 42 U.S.C. § 2000e-3(a).   The analysis for discrimination and retaliation

is the same under Title VII and Section 1981 so both claims can be addressed together.  *See Abebe*, 35 F.4th at 606 n.1.

In the Seventh Circuit, there are two distinct routes to prevent summary judgment in a retaliation case.  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  As shown below, only one route is available to Van.  And as always, the Court analyzes the record as a whole to determine if it would "permit a reasonable factfinder to conclude that the plaintiff's [protected activity] caused the . . . adverse employment action."  *Lewis v. Wilkie*, 909 F.3d 858, 871 (7th Cir. 2018) (quoting *Ortiz*, 834 F.3d at 765).

One route identified in *Stone*—called there the "indirect method"—is essentially an "adaptation of McDonnell Douglas to the retaliation context."[13]  *Stone*, 281 F.3d at 644.  Van would be required to show that "only [she], and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though" she was performing satisfactorily.  *Id.*  The Court already held above that no reasonable jury could find Van was performing satisfactorily or that the EPs were similarly situated to her.  *Supra* pp. 6–12.  Thus, Van's "only recourse" is the direct method from *Stone*.  *Sylvester*, 453 F.3d at 902.

## B.    The "direct" method

---

[13] To be clear, the Court will refer to "direct" versus "indirect" *methods* as a short-hand and not as a reference to what types of evidence the Court considers.  *See Sylvester v. SOS Children's Vills Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006) (describing "misleading dictum").  The Seventh Circuit has warned against separation of "direct" versus "indirect" *evidence* in race discrimination cases.  *Ortiz*, 834, F.3d at 765.

The first route identified in *Stone*—called there the "direct" method—is unrelated to the *McDonnell Douglas* framework. *Stone*, 281 F.3d at 644. Eventually, the method boils down to asking whether "the defendant presents unrebutted evidence that he would have taken the adverse action against the plaintiff *even if* he had had no retaliatory motive." *Id.* (emphasis added). The Parties pursue this route by listing the three elements it has been delineated into: "(1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003) (citing *id.*); *accord Kedas v. Ill. Dep't of Transp.*, 2025 LX 399432, at *9 (7th Cir. 2025). Here, the Parties do not dispute that Van engaged in a statutorily protected activity by complaining of race discrimination, so the Court focuses on the adverse action and causal connection.

### i. Adverse retaliatory action

To allege an adverse employment action in the retaliation context, a plaintiff must show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making . . . a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation modified); *see also Arnold v. United Airlines, Inc.*, 142 F.4th 460, 475 (7th Cir. 2025). This standard "is easier to satisfy than the comparable standard for Title VII discrimination claims, which is limited to discriminatory actions that affect the terms and conditions of employment." *Lesiv*, 39 F.4th at 912 (quoting *Burlington N.*, 548 U.S. at 64). Congress intended for the

two provisions to serve different purposes—antidiscrimination protects *status* while antiretaliation protects *conduct*. *Burlington N.*, 548 U.S. at 63.

Many of IU Health's actions here would have dissuaded another employee from complaining of racial discrimination. Issuing Corrective Action III is materially adverse because it deprived Van of opportunities to lead.[14] (MOU 2, ECF No. 49-21; Nyland Dep. 20:24–22:15, ECF No. 57-3.) Plus, all the Parties call it a "demotion," which is certainly adverse. (Def.'s Br. 22, ECF No. 51; Pl.'s Resp. 4, ECF No. 56.) It is immaterial that Corrective Action III may not have gone into effect or that Nyland reduced it to a Level II Action because Van's refusal led to another adverse action: forcing her to choose between resignation or re-assignment. (MOU 2, ECF No. 49-21; Nyland Decl. ¶¶ 24–27; 28–30.)

All of the options Nyland presented—demotion, re-assignment with possible termination, resignation—all amount to materially adverse options that would dissuade another employee from opposing discrimination. *See, e.g., Lesiv*, 39 F.4th at 913 ("Having to choose between insubordination and an unreasonably dangerous assignment could produce such dissuasion."); *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627–28 (7th Cir. 2007) (finding adverse retaliatory action where employee was asked to "either accept a lower position at another branch or resign"); *Goodwin v. Bd. Univ. of Illinois*, 442 F.3d 611, 619 (7th Cir. 2006) (finding demotion adverse even though

---

[14] Though Van concedes the demotion to EP was not based on race, she does not concede the issue of whether it was retaliatory. (Pl.'s Br. 16–17, ECF No. 56.) For the sake of determining whether it was an adverse action, the Court could even assume retaliatory motive. *See Lesiv*, 39 F.4th at 912 ("As we focus on this element of [plaintiff's] claim, we must assume the employer acted with a retaliatory motive.").

later rescinded).  Also, it is undisputed that IU Health terminated Van, regardless of how it tries to downplay that action as necessitated by its own re-assignment process. *See supra* pp. 4–6.  IU Health makes no new arguments as to why those actions would not all be adverse under the standard for retaliation.  And so, the Court concludes a reasonable employee would have been dissuaded from making a charge of race discrimination.

> ii.  <u>But-for causation</u>

The causal connection prong is where the rubber meets the road for Van's retaliation claim.  "Title VII retaliation claims require proof that the desire to retaliate was *the* but-for cause of the challenged employment action." *Univ. of Tex Southwestern Med. C v. Nassar*, 570 U.S. 338, 352 (2013) (emphasis added).  Van must show that but for her complaining about race discrimination, IU Health would not have taken the adverse action. *See Mollet v. City of Greenfield*, 926 F.3d 894, 897 (7th Cir. 2019).  Factors other than her engaging in protected activity could contribute to bringing about an adverse action, but, regardless, at summary judgment, a plaintiff must show a genuine dispute of material fact about whether "the adverse action would not have happened without the activity." *Id.* (quoting *Carlson v. CSX Transportation Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014)); *see also Murphy*, 140 F.4th at 918 (noting that courts must "consider the complete record and assess whether a reasonable jury could infer retaliatory intent").  Van does not meet her burden here.

Van utilizes three common categories of circumstantial evidence to argue causation: "suspicious timing, ambiguous statements oral or written, and other bits

and pieces from which an inference of retaliatory intent might be drawn." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 711 (7th Cir. 2013) (quoting *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1180 (7th Cir. 2013)). Each, standing alone, may be sufficient to preclude summary judgment. *Murphy*, 140 F.4th at 918.

Suspicious timing is rarely sufficient to show causation, but it can sometimes raise that inference, especially in combination with other evidence. *Garcia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). This is Van's strongest—and only—argument. She alleges that she raised complaints of race discrimination "beginning in February 2023 through June 2023 to Kelli Fletcher and Brayton Nyland." (Pl.'s Resp. 5, 15, ECF No. 56.) There appears to be a pattern where IU Health escalated their disciplinary action after each time Van complained. *Coleman*, 667 F.3d at 861 (quoting *Hunt-Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d at 1014 (7th Cir. 1997)) (finding pattern supports the existence of a causal link). But the escalations also coincide with Van's rejection of discipline. For efficient illustration, the Court lays out a timeline of the pertinent events during those months:[15]

- February 2, 2023: EP Harman complains. (ECF No. 49-10.)
- February 10, 2023: EP Purvis complains. (ECF No. 49-11.)
- February 15, 2023: Van has conversation with Nyland about race and inequitable task completion.[16] (Van Dep. 77:13–78:11, 95:3–96:2, 170:7–9, ECF No. 49-27.)
- May 1, 2023: EP Harman complains. (ECF No. 49-12.)
- May 8, 2023: EP Purvis complains. (ECF No. 49-13.)

[15] Events highlighted in green are interpreted as statutorily protected activity. Events in red are adverse actions per the standard for a retaliation claim. Events in grey are potential non-discriminatory reasons for an adverse action.

[16] Van also appears to have had subsequent conversations in 2023 where she told Nyland she is held to a "difference [*sic*] standard because of cultural and racial bias." Since IU Health does not dispute that Van complained about race discrimination in February, the Court construes the conversations as such at the summary judgment stage.

- May 9, 2023: Nyland and Hunt meet with Van and Van says her comment about "training these personalities" was a joke. (Van Dep. 101:11–102:22, ECF No. 49-27.)
- May 10, 2023: Nyland issues Corrective Action III. (ECF No. 49-15.)
- May 16, 2023: Van complains to Fletcher about Hunt's comments about her hair and Nyland's comment about her voice and alleges EPs are biased against her because of her race. (Email, ECF No. 49-18, at 2; Fletcher Dep. 102:8–103:13, ECF No. 57-5.)
- June 7, 2023: Nyland, Hunt, and Fletcher meet with Van and give her a choice between staying as an EP or going through re-assignment. (Van Dep. 127:4–23, ECF No. 49-27; Fletcher Email, ECF No. 49-20, at 5.)
- June 16, 2023: Van tells Fletcher, Nyland, and Hunt, "I believe this is due to my race." (Van Email, ECF No. 49-20, at 5.)
- June 19, 2023: IU Health notifies Van that since "she had not responded as requested[,]" her remaining options were to resign or go through re-assignment. (MOU 2, ECF No. 49-21; Van Dep. 131:16–20, ECF No. 49-27.)[17]
- July 25th, 2023: Van is involuntarily terminated, effective July 20, 2023. (Termination Letter 2, ECF No. 49-23.)

There are two critical periods where Van's protected activity was followed by an adverse action within a matter of days. And from that suspicious timing, a jury could infer causation. *E.g., Garcia*, 842 F.3d at 1021 (affirming jury verdict where two weeks passed between protected activity and adverse action); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 569 (7th Cir. 2015) (reversing summary judgment even though seven months had passed). Between May 16th and June 7th, Van was only at work for five days because the rest of the time she was on paid leave. (Van Dep. 127:9–15, ECF No. 49-27.) It is possible that IU Health could not present Van with an adverse action until she returned, which would then shorten this gap. Second, between June 16th and June 19th, IU Health decided to escalate their adverse action by removing

---

[17] The MOU is dated June 16, but Nyland signed it on June 19. The Court goes with June 19 because that is the date IU Health identifies in its argument. (Def's Reply 14, ECF No. 61.)

the option to stay as EP and forcing Van to either resign or go on re-assignment. This four-day period could be sufficiently close for a reasonable jury to infer causation.

IU Health avers this four-day period is irrelevant because it did not strip Van of the option to be demoted on June 19th; "rather, she refused it." (Def.'s Reply 14, ECF No. 61.) Even if IU Health's actions could be understood as a response to insubordination, that still does not stop the Court from finding it adverse enough to dissuade another employee from complaining of discrimination. *Lesiv*, 49 F.4th 903, 913 (finding dissuasion where employer forced plaintiff to choose between insubordination and an unreasonably dangerous assignment). IU Health paints a world wherein an employer's actions would not dissuade others simply because it is in response to an employee's disagreement. The Court will not indulge in such reverie. *See, e.g., Castro*, 786 F.3d at 569 (employer cannot retaliate "under the ruse that the employee was being 'disloyal' or 'insubordinate'").

But other than suspicious timing, the record is devoid of any "other bits and pieces from which an inference of retaliatory intent might be drawn." *Perez*, 731 F.3d at 711; *cf. Coleman*, 667 F.3d at 859–61 (reversing summary judgment once plaintiff showed both timing and pretext). Van's pretext argument is similarly unavailing for retaliation. Though the EPs did not make a complaint of race discrimination,[18] Nyland's preferential treatment of them is still not indicative of retaliatory intent because, as stated above, the EPs can be held to a lower standard and were never

---

[18] The Court notes that one of EP Purvis's emails could be construed as a complaint of race discrimination. (*See* December 9 Email, ECF No. 49-4.) However, IU Health does not dispute this fact so the Court considers the argument waived.

accused of belittling others. *E.g., Coleman*, 667 F.3d at 859, 861–62 (finding pretext for retaliation because another employee received more lenient punishment for comparably serious violation of same rule); *Abebe*, 35 F.4th at 608 (finding suspicious timing insufficient to establish causation without comparator evidence).

The record does show that EP Purvis, a white man, assumed Van's duties upon her termination. (Nyland Dep. 40:16-25, ECF No. 57-3; Hunt Dep. 71:12-18, ECF No. 57-4.) But this is immaterial without showing EP Purvis had retaliatory intent, which is impossible since he did not know Van engaged in protected activity. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (affirming summary judgment on retaliation claim because no affirmative evidence of a subordinate who had unlawful motive and intent to bring about adverse action). Van also fails to allege Nyland was at all influenced by EP Purvis's bias. *E.g., id.* (finding no cat's paw theory availing).

Next, while "ambiguous statements" could also raise an inference of retaliation, they must be made by the decision maker and connected to the decision. *Perez*, 731 F.3d at 709. Three months after Van complained about inequitable task distribution due to "cultural and racial bias" in February 2023, Nyland made comments that he could not find somebody with a more "booming" voice than hers. (Van Email 3, ECF No. 49-20.) Assuming the February conversation constituted protected activity, and recognizing Nyland's comment followed that activity, there is still only a weak inference without Van tethering the commment to Nyland's decisions to escalate her discipline. (*See* Van Dep. 166:1–16, ECF No. 49-27 (describing it as comments she

heard "around the office"); *e.g., Khungar*, 985 F.3d at 578–79 (finding termination "untethered" to complaints); *cf. Perez*, 731 F.3d at 709–11 (only finding stray remark probative of pretext when accompanied by adequate comparator evidence and evidence supervisor credited comparator over plaintiff).

Lastly, the Court sees important distinctions between Van's retaliation claim and others that have survived summary judgment: the plaintiff in *Coleman* had successful comparator evidence to show employer's inconsistent explanations were pretext, 667 F.3d at 861; the plaintiff in *Castro* had an email referencing the protected activity as a reason for the adverse action and evidence of the employer lying, 786 F.3d at 579; and in *Huff v. Buttigieg*, the plaintiff prevailed on a federal-sector retaliation claim—with a less stringent causation standard—by showing that a rarely enforced rule was mobilized against her. 42 F.4th 648–50 (7th Cir. 2022). Moreover, Van's evidence is not similar to those who have prevailed at trial. In *Garcia*, the plaintiff presented evidence to the jury that she did not engage in the misconduct— which Van does not have because she admitted her behavior in May leading up to her termination—and that the employer often did not punish the misconduct, which Van also does not have. 842 F.3d at 1020.

In conclusion, the Court holds there is no genuine dispute of material fact and IU Health is entitled to summary judgment on Van's retaliation claim. This is a case where suspicious timing, standing alone, is insufficient because the record is devoid of other evidence to suggest that retaliatory intent was *the* but-for cause of IU Health's adverse actions. *Mollet*, 926 F.3d at 897. While IU Health's escalation in

discipline after Van's complaints may have been extreme, no reasonable jury could conclude that IU Health did so in retaliation for opposing racial discrimination.

### Conclusion

For the reasons the Court has set forth, IU Health's Motion for Summary Judgment, (ECF No. 48), is **granted**. Van's claims of race discrimination and retaliation arising under Title VII are **dismissed**. Final judgment will be issued separately.

**SO ORDERED.**

Date: _____10/24/2025_____

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

Amber K. Boyd
Amber Boyd Attorney at Law
amber@amberboydlaw.com

Bonnie L. Martin
Ogletree Deakins
bonnie.martin@ogletree.com

Stephen Rollins, II
Amber Boyd Law
stephen@amberboydlaw.com

Caitlin S. Schroeder
Ogletree Deakins
caitlin.schroeder@ogletree.com